As it stands today, this is a comparatively easy case for the Court for two reasons. First, Mr. Badawi has demonstrated conclusively that he is factually innocent of the financial aid fraud count. The facts demonstrating his innocence are undisputed, and it's as a matter of law he's innocent of that count. That's an easy issue. Well, that doesn't sound so easy to me. I know my friend disagrees, but the second reason why this is an easy case is that Mr. Badawi was never given a hearing on non-frivolous claims of ineffective assistance of counsel that infect his 30-year joint stat max consecutive sentence in a variety of ways. And so, I'll start with the conversion issue, the misapplication fraud count and his innocence of that. Well, first of all, let me just say that we'll give you some more time. Because we've granted COA, there are more issues than would appear, so don't get too bound up in the time. But, what exactly kind of actual innocence claim are you making? You're making a schlup actual innocence, you're making an actual actual innocence? We're making two related claims, Your Honor. The first is a freestanding, he is factually innocent of the financial aid fraud count. But, relatedly... Do we know that that's, I mean, there is no Supreme Court law saying that on habeas, that kind of actual innocence is necessarily cognizable, is that right? Well, the Supreme Court has said that someone can bring a claim if they demonstrate that the act for which they were convicted, the law doesn't make criminal. That comes from Davis. And that is this type of claim where... But doesn't that, this claim of actual innocence relies on us adopting the definition of conversion that you espouse. The government espouses that there's several different definitions of conversion, one of which doesn't require that it be property of another. And the district judge here, well, the Ninth Circuit has never held that conversion is an element of this crime. And the district court found that misapplied, that conversion wasn't required, that it was misapplication, and that misapplication had its ordinary definition, and under that, he misapplied. So, don't you require us to hold that conversion is an element of this crime, and that conversion is only defined as the using the property of another? And your argument, as I understand it, is the Pell Grant money was his property. He may have misused it, but he didn't convert it since he didn't take the property of another. To your question on whether the court has to adopt conversion as an element, the answer is yes, because Bates requires this court to say that. And the government conceded in both its answering brief and in Bates that conversion is an element of this crime. Okay? Should there have been a jury instruction on that? Absolutely. And for exactly the reason that your Honor, Judge Bolton points out, that misapplication and conversion don't, in the ordinary sense, mean the same thing. But what's the definition? The definition is the one that the Supreme Court gave in Bates, which is that this statute, 1097A, requires unauthorized control or dominion that interfered with the rights of the funds' true owners. So the ownership of the funds is critical to whether or not conversion occurred, and the court is required to find that as well, because it comes from Bates, the Supreme Court's only case analyzing the elements of this statute. So, as a matter of law, the court, those are the elements, and I don't take my friend on the other side to really meaningfully dispute that anymore. But, I mean, Bates didn't really address this question directly. It said that this is what the Seventh Circuit said, and he seemed to say that it wasn't really an issue in the case because the issue was intent. But where do you think Bates actually said that conversion was an element? Well, Bates says that this statute survives scrutiny and affirms the Seventh Circuit because of this conversion element that the Seventh Circuit described. So it's true that Bates is not confronting a student making a purchase we disagree with. That wasn't, those weren't the facts from the Seventh Circuit. But the reason, the reasoning of the case depends upon their saying this is saved, this is not improper, because the intent of the crime requires you intend to interfere with somebody else's property. So let's assume for a minute that we don't agree that Bates holds that conversion with your definition is an element, and yes, the Seventh Circuit, in a context where somebody misused somebody else's money, did hold that. But the Ninth Circuit, if Bates isn't controlling, the Ninth Circuit gets to decide whether conversion is or is not an element, doesn't it? If Bates is not controlling, then it would be, it may be an open question before this court, but every other circuit court to address it has ruled the same way, consistent with Bates. Didn't those cases arise in a totally different context? It wasn't the grantee of the Pell Grant misapplying the money. It was the person who came into possession of the grantee's money who converted it to their own use. Well, those other cases, like Kammer out of the Eleventh Circuit, they arise in a situation that would normally be more egregious type of misapplication. Like in Kammer, the defendant was a school administrator who was a trustee over the Title IV funds directly from the Department of Education, and Kammer held that doesn't qualify, that the moving of those funds into an operating account that was no longer subject to direct supervision and control by Department of Education, because it wasn't the trust fund, that that movement of the funds wasn't conversion, and therefore wasn't misapplication. For Mr. Badawi, by contrast, the money has been dispersed at the point that it reaches his account three separate times from the Department of Education, and he's in no way a trustee over them. Let me ask a question about that. The account was actually a separate, discreet account set up for the receipt of these funds, so how do we know that it was actually an account that he could use for anything he wanted? Well, you know that because, and the record demonstrates, he repeatedly pulls funds out in cash, and I don't think the government disputes... Well, right, he pulls it out in cash, but the notion that it was unrestricted ownership is not so clear, given the particularly, the odd character of this account. It was, as I remember, it was a proprietary company that set up this account for the purpose of receipt of Pell funds. Right, and it's a third party called Hire One, and I guess insofar as the court believes that those factual distinctions matter, it has to reverse for an evidentiary hearing, because we're at least raising a non-frivolous claim that factually he had complete dominion and control over the funds. Well, speaking of raising the claim, this was not on direct appeal. This conversion theory was not raised on direct appeal, correct? Correct. So why isn't it procedurally barred? Because the reason it was not raised before was, and this goes to the second point, and why I said there are two separate related claims, counsel was ineffective in never uttering a word about this, or raising it on direct appeal. But if the Ninth Circuit has not clearly said so about the conversion theory, and the Supreme Court, although you may disagree, has not specifically indicated as much, then how was that clearly established? That he would need to raise that? Well, two answers, and first, I emphasize, I don't think the government contends conversion is not an element of this crime, but second, this court has never said that there's sort of a, to borrow from Section 1983 jurisprudence, that there's like a clearly established qualified immunity rule for counsel, that the prevailing professional norms are a mixed question that we should be able to develop at an evidentiary hearing. And this came up in the context of, oh my gosh, I see my time has expired. Go ahead, go ahead. This came up in the context of Mr. Badawi's double jeopardy claim before the district court, where at 1 ER 18, the district court said, Mr. Badawi, in his petition, raises a claim that he was subject to double jeopardy, and there is persuasive, multiple published appellate decisions saying that he was subject to double punishment in violation of the double jeopardy clause, but those circuit cases happened to arise outside of the Ninth Circuit, because the factual circumstances presented here hadn't arisen in the Ninth Circuit. So although there are cases in other circuits saying he was subject to double jeopardy, it's an open question here, and the district court said, you may be right about the double jeopardy, but prevailing professional norms don't require that counsel research cases in other circuits. And that can't be right as a matter of law, especially in a case like this, where we're not allowed to explore the facts. But what is true is that the, first of all, Bates, for example, this is an example, it says under the Seventh Circuit's construction, 1097A catches only the transgressor who intentionally exercises unauthorized dominion over federally insured student loan funds for his own benefit or for the benefit of a third party. Now, that definition does not say anything about who has the ownership, and it seems to me applies here. So there, and then there's the Morrissette definition, which seems to apply here. The government's essential argument is, yes, it's conversion, but it means something like what I just read, and it doesn't depend on the government retaining an ownership interest. To that point, Your Honor, when Bates uses, and the quote you just read used the phrase unauthorized dominion, that's a reference to other places in the same decision where the court talks about what is authorized and what is unauthorized. And what is unauthorized is any action that affects the true owner's property rights. That's what makes the exercise of dominion improper. And this court's cases, the cases the government cites that talk about conversion in the context of other statutes illustrate the same thing, and I know, I won't belabor that. Well, Morrissette, for example, I mean, does in fact have language that seems to suggest that it's not necessarily the full common law definition, and it includes essentially disobeying the conditions on your custody of these funds, whether, and without much caring about where the technical property right is. Well, two responses to that. First, the government doesn't have, doesn't cite any case in the Ninth Circuit saying that funds under circumstances like this are still under their supervision and control such that they would ever qualify as conversion, because they couldn't audit Mr. Badawi. They couldn't demand an accounting of the spending from Mr. Badawi. They couldn't do any of those things. And how do we know any of that? What's that? How do we know that they couldn't demand an accounting? Well, because the use of the use of I would expect they could. You think they couldn't? I don't think they could, and the government has never claimed otherwise. Their ability to audit applies to school administrators, and that's really who the target of this statute was to begin with. But even there, when you look at Kammer, which I acknowledge is not this circuit's case, but in Kammer, the court says, even for that school administrator, who's a trustee of the funds and has to submit to audits and has to report the use of the funds, there still isn't sufficient supervision and control over these funds. Well, Mr. Badawi left school, he has to give the money back, right? If he, I think if he left mid-semester, he would be subject to the reimbursement provisions for part of the Pell Grant money. Well, that's a strange sort of ownership, then. No, it's exactly the type of debtor-creditor relationship that the court confronted in Lawson, where the bank sends, they send you a bill. They say, hey, you owe us a little bit of money. That kind of debt doesn't entitle them to claw it back. It doesn't entitle them to demand an accounting before the money is spent. It's a debt. But a debt is not the same as ownership, otherwise, like any creditor would continue to be able to claim conversion when someone they loaned money used it in a way that they disapproved of. And no court has ever said that. So you don't think that if there were, if a Pell Grant recipient withdrew from school during the semester, that the Department of Education couldn't get the money back from a third party like this higher one, if it was still in the account? No, I don't think so. And there's no evidence to suggest they could. At that point, the money has been disbursed to three separate entities down to Mr. Badawi. It is a grant. And they could ask for, they could send a bill for reimbursement. That's what the regulations permit them to do. They could try to enforce that by submitting it to creditors and things. But the reason Congress drafted the statute not to allow that, not to treat every student's purchase as conversion, is because it's not a crime to, the definition of misapplication becomes too amorphous otherwise. And that's really what Bates is about too, because it's not just about the propriety of a student's use of money. You know, the educational purposes standard that the witness, Ms. Mendoza, testified to in Mr. Badawi's case, that doesn't arise from the statute anywhere. But if it's correct, it would encompass all manner of uses of grant money. You're not seriously contending that buying somebody else an airplane ticket to go to the Middle East was an authorized use of his Pell Grant? I don't know what the court means by authorized, because... Was it an allowable? Didn't he sign something that said, I promise I'm going to only use this money for my legitimate educational expenses? That may not be exactly what it said, but it essentially said that. So, the contours of that document that he signed, those don't exist within Section 1097A, right? That's a separate agreement that he's made in applying for the money before it's been dispersed. And there's no allegation that he knew at that time that he intended to use it in a contrary way. It's not that type of misrepresentation fraud case. There's no allegation or evidence that when he applied for Pell Grant funds, he was lying or misleading anybody. And so, the question becomes, what does that prior statement, when applying for a grant, mean about future uses of the funds? And if it reaches the plane ticket legally, within the context of 1097A, it would also reach any student's purchase of beer that's not for educational purposes. It would reach any type of purchase that a jury later thinks they knew was improper. Counsel, hold on. Judge Berzon, any additional questions? No, unless there's anything you want to say about any of the other issues, very quickly. Quickly, on the ineffective assistance and the sentencing, the court should remand for an evidentiary hearing on the effect of ineffective assistance, and there are related claims. The core claim is about whether these sentences at the statutory maximum should have run consecutive, and the district court ruled against Mr. Badawi on the—the government here argues that the crime was so heinous that the sentence would have been the same, and the sentencing counsel's advocacy was great in a lot of other ways. Because we were denied an evidentiary hearing, we were never allowed to contradict those, and Mr. Badawi had claims that the trial counsel failed to bring other critical arguments, like the double jeopardy argument below, and they failed to present mitigation that was obviously available. And today is the first hearing Mr. Badawi has had in this case since his original direct appeal. It's the first time his family has been able to come to a courtroom. That's not the way Section 2255 says these petitions are supposed to work. Judge Bolton, any— Nothing further. All right. Thank you. I'll give you a minute afterwards. Thank you. Good morning, counsel. Good morning. May it please the court. Carly Palmer on behalf of the United States. This court should decline defendant's invitation to create a circuit split with the First, Fifth, and Second Circuits sentencing law, and to further find that his counsel was constitutionally ineffective for putting forth that outlier claim at sentencing.         Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you. Thank you, Your Honor. Happily. I'm not—the district judge, when he gave the instructions, said misapplies means misapplies in its common ordinary meaning. Why is the government conceding conversion as an element? The government conceded conversion as an element in the Bates case, and we are staying consistent with that position. But our definition of conversion is very different from defendants. I know it's different, but are we compelled by Bates to find that conversion is an element? Not by Bates, but I think Morrissette is helpful here. And Morrissette defines criminal conversion as being incredibly broad. It talks about conversion being the thing that sort of fills in the gaps when you look at a— But that's not what Judge Bolton's asking. She's asking—I think she's asking, if we're not bound by Bates, you nonetheless appear to be conceding that conversion in some sense is an element rather than the plain meaning of misapply. I mean, it seems that here what we know is that there were conditions as to what he was allowed to spend his money on, and he spent it on other things. That sounds like misapplied by any ordinary language. And nonetheless, the government agrees that this requires conversion in some sense, and certainly conversion usually, at least in most cases, seems to—and traditionally under the common law does mean converting somebody else's property to your own use. So I don't think that's how Morrissette describes criminal conversion. It talks about knowing conversion adds significantly to the range of protection of government property without interpreting it to punish unwitting conversion. And it talks about how conversion helps to fill in the gaps between all these different kinds of fraud crimes that Congress was trying to prosecute, and they wanted to make sure fraudsters couldn't fall through what they called gaps and crevices. But couldn't we just say misapplies means misapplies in its common and ordinary meaning and not go down this conversion path? Yes, Your Honor, and I think the— But that's not what you've conceded. It's not what we conceded in our briefs. Obviously, this Court gets to do what it wants. You know, I think that either way, the government wins. I do believe— But there's a reason why. I was curious as to where this whole idea came from, that misapplied means conversion. And it goes back to the 19th century case, which was very uncomfortable with the word misapplied because it had no common law meaning, and it would seem—in a particular case, it seemed to apply to a maladministration of the money, and they said that we don't want to—so we're essentially going to— It was something like a vagueness decision in the bank misapplication context, and in that context, it makes some sense. So it was really just quiet with the lack of any legal background for this language. So why isn't that a good reason right there? It may well be, and I do think it is straightforward. The Black's Law definition is straightforward.  Defendant was given a federal grant to pay towards educational costs and attendant living costs. He used it to buy a plane ticket for someone else to go fly to fight for ISIS against U.S.-led coalitions. That's clearly a misapplication, regardless of whether there's conversion or not. That is— Shouldn't that have gone to a jury? Shouldn't there have been a jury instruction? It's the same question I asked your friend here on the other side. Shouldn't there have been a jury question that goes to them, that they then make a determination on this critical element? No, Your Honor, and that's because conversion is this broad definition that includes common-sense misapplication. Well, that's the government's proposed definition, but which definition are we going to take? I believe that we should take the Supreme Court's definition in Morrissette. We disagree that the Supreme Court adopted this much narrower Seventh Circuit interpretation In Bates, it talks about the Seventh Circuit's construction, which it wouldn't have needed to do if it was adopting that definition. And even the Seventh Circuit cases cited by the defense, Bates and Christovich, describe Morrissette as a seminal case when it comes to describing this. And the government's definition has no—there's no control element then in the government's definition, correct? No. If that's the case, though, can't the government's own definition then lead to these crazy results where someone's going to be prosecuted for using some of their money for Netflix? No, Your Honor, and that's because of mens rea. Mens rea is the primary protection for defendants against government overreach. That's discussed by Morrissette when they talk about how you would have to have the right mens rea to be prosecuted for this. And it's clearly embraced by the jury instructions here. The jury was told, you have to find that he did this knowingly and willfully, that he knew he was breaking the law when he did this. That was very clear in the jury instructions. It was argued that way by the prosecutor. There was a five-minute closing argument just on this count where the prosecutor walked through all four elements and talked about all the evidence that defendants' misuse of this money wasn't an avertant, wasn't innocent, that it was purposeful. Buying food to support your living costs when you're in school, that's something that's covered by a Pell Grant. Buying something for somebody else certainly isn't. And you can tell that there's this, you know, even if you were to buy the defendant's argument about conversion, we would still win because there is a regulatory scheme here that extends all the way to the student. So if you look at the record at pages 235 and 237, there's an agreement, a direct agreement between the government and the student. This is what these funds are going to be used for. You only get to use these funds for education and the things that support that education. Things like your living costs, things like food. And we're going to put these funds in a separate account with a card that you can use. And that's going to help us track things. And there's a comprehensive regulatory scheme that reaches the college, that reaches the third-party distributor, and reaches the student. So the student can be held responsible. But he had taken all the money out of that account and put it in his own bank account and paid his tuition from that? He could have, Your Honor, yes. That would have been okay? It would have been okay because he would still be using it as an authorized use. I understand that, but I'm trying to focus on the character of the account. So it's not that you have to pay the expenses out of the account. You don't have to pay them directly out of the account. You can certainly pull out cash to pay them otherwise. With regard to... I have two other questions. With regard to Morrissette, what other cases or situations have used the Morrissette definition? Andreen, this court's decision found that conversion encompasses the use of property placed in one's custody for a limited purpose in an unauthorized manner or to an authorized extent. And in Thorderson, this court found that conversion was even broader than stealing because it could be accomplished without a wrongful taking. And in Azita, this court talked about the statute's broad purpose to provide broad protection for Title IV financial aid funds entrusted to private educational institutions. So that's similar to the broad legislative purposes discussed in Morrissette we were talking about, wanting to make sure that we're capturing all of these different fraudulent crimes. To go back to Britain, which was the 19th century case which generated this to begin with, what they were concerned about is that there were a lot of bank regulations that said you have to use, you know, you can't do this and you can't do that and so on. And on that definition, would a violation by a bank of bank regulations become conversion? No, Your Honor. And that's because of the mens rea requirement, which Morrissette discussed. It has to be... I'm sorry. How does the mens rea requirement help that if they were in fact, they were in fact using the funds, you know, knowingly in violation of bank, of federal banking regulations, although not for their own benefit necessarily, or even for their own benefit, but not in any way that, I guess not for their own benefit. Does it have to be for their own benefit? It has to be knowingly and willfully unauthorized. So... It doesn't have to be for their own benefit. I don't believe so, Your Honor. But I'd be happy to look into that further. Doesn't banks... Not banks. Bates, doesn't Bates at least say it has to be for their own benefit? Or for the benefit of another? The Supreme Court's decision in Bates or the Seventh Circuit's? No, the Supreme Court case. It's a sentence I read before. It catches only the transgressor... That is the Seventh Circuit's definition, but it's the one they quote. It catches only the transgressor who intentionally exercises unauthorized dominion over federally insured student loan funds for his own benefit, for the benefit of a third party. I mean, that, I think, does cover this situation. Right? It was for his own benefit, and it was unauthorized. I agree, and I also feel that that was within the... But it doesn't depend on ownership. It doesn't. And that's also within the caveat of the Seventh Circuit's construction. And looking at the Seventh Circuit cases, in Christovich, I want to point out the distinction that Christovich makes with another Second Circuit case, which involves a grant. And that's the Croft case. And there they said that they did find conversion in a case where an EPA grant was used to pay a research assistant, and a professor then had that research assistant convert her employment, her time, her labor to his own personal commercial uses. So even in the Seventh Circuit, there are situations involving grants that are considered conversions. And in the Ninth Circuit, I think the Aubrey case is the best example of even if you were to take the defendant's definition, here you would still have conversion. But then we're still left with Judge Mendoza's problem, which is this did not go to the jury on that definition either. So again, I would go back to the broad definition under Morissette and under this court's interpretation. But it's a harmless error argument that you're making. I don't think it's a harmless... I mean, one couldn't get out of misapplication any of this, right? If you're not doing what Judge Bolton suggests, and simply saying misapplied means misapplied, it's one form of non-obvious definition or another form of non-obvious definition, and why shouldn't it go to the jury? I think any definition that would have gone to the jury would have incorporated this common sense black law dictionary. But it's not so common sense. Of misapplication. I mean, here, clearly, I don't think there was any issue. 30 minutes talking about the definition. Yes, I disagree that... I don't think this is a comparatively easy case. I'd agree with that. But I don't think there was any confusion on the law given to the jury and the facts given to them that in this particular case, where defendant was using funds he agreed would only be used for educational costs and related living costs, when he used them to buy something for someone else to go fly to the Middle East, fight for ISIS. I don't think there was any confusion there about whether or not that's a misapplication or a misuse of funds. It's certainly beyond what he was authorized. And again, there's a direct agreement between the government and the student about what those funds are. He took out four FAFSA loans. So four times he certified, I'm only going to use these funds to go to school. There's also an implication in the record that perhaps the reason that he used these funds to buy the ticket was to cover up who was buying the ticket to kind of help defer government prosecution. So that adds to the evidence of willfulness. There's a lot of protection here for a defendant from overreach by that mens rea. And I think that also distinguishes other cases that are cited by the defense, like the Middle District of Florida case and the 11th Circuit cases. In both of those cases, one of the concerns looked at by the court was insufficient evidence of an intent. And so that wasn't an issue here. And that's why I believe this case falls far to the other side. Are there any other questions about the conversion matter? And if not, may I briefly address the sentencing issue? Yes, the double jeopardy question in particular. So I framed as the guidelines challenge here. So this court should decline the defense's imitation to grade a circuit split with well settled First, Second, and Fifth Circuit law about this guidelines directive. And certainly it shouldn't find that it was ineffective of counsel at sentencing to decide not to put forth this outlier argument that has never been endorsed by this court, was outright rejected by those other courts, and has only been discussed in dicta by the Third Circuit 20 years ago. There's a very in-depth conversation of the reasons to do that in CAPEF. It's also outlined in the First Circuit decision, Secatia, as well as— That's a statutory argument, right? There's also a direct double jeopardy argument, as I understand. I'm sorry, Your Honor. Could you please repeat that? There's also a direct double jeopardy argument. In addition to the statutory argument, it says essentially you can't have consecutive sentences for conspiracy and the underlying— I think any direct double jeopardy argument would fly in the face of the discretion given under 3583 to judges to issue these consecutive sentences. And so I don't view that as an issue here. I mean, there is direct legislative history showing that there is a ban on having consecutive sentences for an attempt and the object of the attempt. Congress thought about doing that for conspiracy and decided not to. Instead of doing that, they gave this general inappropriateness directive to the guidelines, which overwhelmingly addresses that in the grouping concerns, and only in these kind of rare and unusual cases, cases like Mr. Badawi's, are you seeing this issue where the guidelines are higher than the stat max. And that is by congressional directive. The reason that Mr. Badawi's guidelines were so high in this case is because of the application of 3A1.4. That was enacted as part of AEDPA. It was in response to terrorist attacks, and it specifically directed the Sentencing Commission, we want to see a sentencing enhancement for anything that's providing support to foreign terrorists, hear ISIS. So that is the reason that the guidelines range was so high. So there's nothing about his sentence that is opposed to congressional intent. And here on this record, too, I agree that in the vast majority of cases where the guidelines are found to be different than what the district court found, you would want to remand. But in Melina Martinez, the Supreme Court said there are cases where we wouldn't have to remand based on the facts of the case, based on the specific record. And that's here. This is a case where... Thank you, counsel. Any additional questions? No. All right. Thank you. To Judge Berzon's point about the double jeopardy claim, I think part of why my opponent is not ready to answer the court's question is because no court has yet certified that issue, unfortunately. Because the district court, even though it said there is a double jeopardy violation, said it wasn't unprofessional or inadequate for counsel not to find it. But to the government's answer to Judge Berzon's other question about Morissette and this court's cases interpreting Morissette, the government points to Andreen and Thoderson. But in both of those cases, somebody else owned the funds. Ownership of the funds was baked in, that they had converted funds that were owned by somebody else. So for this court to now say that Morissette means something broader would be uncharted territory that this court has never said before. And to your Honor's point, Judge Mendoza, if the jury had been instructed that they needed to analyze whether or not it fit the government's broader misapplication or conversion definition, I suppose, in a sense, it would have actually lent credibility to the defense attorney actually presented at trial, which was that he still retained the funds in cash. But the problem was that the government flatly rejected that as irrelevant, said the crime was completed as soon as the debit card number was put in. And the jury, because they were not instructed on what conversion means, would never have even been in a position to consider whether retaining the cash meant that it hadn't been sent to an improper purpose. Because he gave that cash to his mother, and there was testimony that he did. All right. Thank you, Counsel. This—the matter of USA v. Vidawi will stand submitted.
judges: BERZON, MENDOZA, Bolton